UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

ANDREA MARIE LINDSTROM,          :
                                                    :     **MEMORANDUM DECISION AND**
                         Plaintiff,       :     **ORDER**
                                                    :
           - against -         :     21-cv-3889 (BMC)
                                                    :

COMMISSIONER OF SOCIAL SECURITY,  :
                                                    :
                         Defendant.     :

-------------------------------------------------------- X

**COGAN**, District Judge.

1.       Plaintiff seeks review of a decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that she is not disabled as defined in the Social Security Act and its regulations for the purpose of receiving disability insurance benefits under Title II of the Act. Despite finding certain mental impairments, the ALJ found that plaintiff had sufficient residual functional capacity to perform light work (20 C.F.R. § 404.1567(b)) with a number of restrictions. Because a vocational expert testified that there were light-work jobs available in the national economy that could be performed with those restrictions, the ALJ found her not disabled.

**The Listings**

2.       Plaintiff's first point of error is that the ALJ improperly found that her mental impairments did not meet the requirements for Listings 12.04 and 12.06. As the ALJ noted, to meet paragraph B of these listings, plaintiff would have to be extremely impaired in one of the four functional areas in the Listings or markedly impaired in two areas. The ALJ found that she was mildly impaired in one area and moderately impaired in the other three. Plaintiff's argument is that the ALJ should have found marked limitations instead of moderate limitations in three

functional areas: (1) interacting with others, (2) concentrating, persisting, or maintaining pace, and (3) adapting or managing oneself.  Plaintiff further contends the ALJ's finding of a mild impairment for a fourth functional area – understanding, remembering, and applying information – should have been marked, not mild.  If plaintiff can get any two of these four functional areas moved up to marked instead of moderate or mild, she would prevail on this point.

3.      It's a difficult argument in the district court review context.  In applying these listings, the ALJ has to make judgment calls based on conflicting evidence in the record.  I am not permitted, of course, to reweigh the evidence and reach my own conclusions.  Only if there is so little evidence to support the ALJ's conclusion, either by itself or in comparison to the conflicting evidence, can I find error.

4.      To support her argument that "moderate" understates her impairment with regard to interacting with others, plaintiff first attacks the underpinnings of the ALJ's conclusion.  She notes that the ALJ cited her ability to live with her husband, talk to her mother, take public transportation, and appropriately deal with authority.  But plaintiff points out that there is no evidence in the record that she has ever dealt with authority, so the ALJ had no basis to conclude that she could.  As for talking to her mother and her husband, plaintiff cites her statements on her disability application that she only talks to her mother once a week (although her husband daily) and does not socialize – that, in plaintiff's view, shows marked, not moderate, ability to interact. And plaintiff qualifies the ALJ's finding that she takes public transportation by citing her statement that she takes it "rarely."

5.      Beyond attacking the ALJ's evidentiary rationale for her conclusions, plaintiff cites additional evidence to support her contention that she has at least a marked impairment in interacting with others.  Her treating physician, Dr. Marilyn Jackson, applying the paragraph B

criteria, and the consultative examiner, Dr. Scott Wilson, both expressly found that she has marked limitations in interacting with others.  And plaintiff's testimony is consistent with those opinions.

6.      Other than noting it, the Commissioner's argument does not comment on the fact that two physicians, treating and consultative, found plaintiff had a marked impairment in interacting with others.  Instead, the Commissioner repeats the ALJ's basis for her "moderate" conclusion – that plaintiff gets along (and shops) with her husband; that she talks to her mother (without commenting on the fact that according to the record, plaintiff only talks to her mother once a week); and that she is able to get along with her medical providers and staff, although noting that at the appointment with Dr. Wilson, plaintiff displayed "marked irritability."

7.      These few pieces of evidence referenced by the Commissioner in her brief would not be substantial evidence, either viewed collectively or as compared to two physician opinions, one of which was from a treater who knew her well.  First of all, let's forget about the subway, whether plaintiff uses it rarely or frequently.  That has nothing to do with "interacting" with others.  A reasonable subway rider gets their MetroCard from a machine, swipes that card on another machine, and then does their best to avoid any interaction with anyone else in the subway system.  In fact, interacting with people in the subway is, to say the least, ill-advised.  I suppose plaintiff's ability to ride the subway can be some indication of the lack of agoraphobia, but as the Commissioner acknowledges (although the ALJ did not), the record shows that plaintiff "rarely" uses the subway.

8.      The other facts to which the Commissioner alludes in her argument aren't much better.  Could the ALJ reasonably conclude that plaintiff can interact with people because she appears to get along okay with her husband and talks once a week to her mother?  I don't think

so.  Her husband is not going to be at work with her daily nor is her mother stopping in at work once a week.  Her relationships are just not comparable to any work environment.

9.      As to records showing her visits to health providers were "cooperative" and "fail[ed] to show difficulties getting along with care providers" – putting aside the fact that this is also an imperfect proxy for how plaintiff would get along with people in the workplace – that's not really a fair characterization.  The Commissioner herself acknowledges that plaintiff was irritable with Dr. Wilson.  Even in the records that the Commissioner cites, a treatment note from psychologist Alexander B. Chervinsky found her dysphoric and nervous or anxious.  The fact that he also found her presentation "appropriate" and "cooperative" says very little to me about how plaintiff would interact with people in the workplace, especially since he also found that she has a "behavior problem."

10.     The only other fact to which the Commissioner refers in her argument is that plaintiff has never lost a job due to problems getting along with people. I agree that has some probative value on this particular functional area, especially since one of plaintiff's prior jobs was interacting with a volatile clientele.  But it is not sufficient, singly or in combination, to overcome the opinions of the only two physicians who examined her and concluded that she had marked limitations in her ability to interact with people.

11.     As to the areas of concentrating, persisting, and maintaining pace, plaintiff is merely seeking to reweigh the evidence.  To be sure, it conflicted.  But the analysis from Dr. Chervinsky constitutes substantial evidence for the ALJ's conclusion.  He concluded that she had average intelligence and her attention span was "quite strong with mostly high average performances on tasks of digit repetition and sequencing."  He found no comprehension problems and normal information processing speed.

12.     Plaintiff criticizes the ALJ not so much for relying on Dr. Chervinsky's assessment, but because of other facts the ALJ found to support her finding that plaintiff has a moderate rather than marked impairment in this area, e.g., that plaintiff can use a computer daily, follow instructions, manage funds, and shop.  (The record is not clear whether plaintiff can shop by herself).  Plaintiff points out that the description of these activities in the record does not contain details necessary to reach a conclusion on plaintiff's ability to sustain activities, such as duration.  That may be true, but it is plaintiff's burden at step 3 to show that she meets the Listings.  It is not as if there are medical records missing that the ALJ had an obligation to secure.  The logical connection between her ADLs and her ability to maintain concentration, persist, and maintain pace is there, and although her ADLs alone may not be much proof that plaintiff has a moderate impairment in this area, when they are coupled with Dr. Chervinsky's findings, there is a substantial evidentiary basis for the ALJ's conclusion.

13.     The remaining two functional areas are adapting and managing, in which the ALJ found a moderate impairment, and understanding, remembering, and applying information, in which the ALJ found a mild impairment.

14.     There is mixed evidence on plaintiff's impairment with respect to adapting and managing.  The ALJ found that plaintiff's ability to care for herself without reminders showed that she does not have a marked impairment in managing herself.  With respect to adaptation, the ALJ considered plaintiff's report to Dr. Chervinsky that she wanted to return to work, which speaks to a desire (but not necessarily an ability) to be adaptable, leading the ALJ to conclude that plaintiff did not have a marked impairment in adapting.  Both these points conflict with other evidence in the record, such as treatment notes from Dr. Jackson stating that plaintiff was largely bedridden for a few years (discussed infra).

15.     The evidence regarding understanding, remembering, and applying information is also a mixed bag.  On the marked impairment side, there is Dr. Jackson's opinion, Dr. Wilson's opinion, and plaintiff's testimony.  On the mild impairment side is Dr. Chervinsky, whose evaluation strongly suggested a mild impairment.  Like with the analysis regarding adapting and managing, the ALJ considered this conflicting evidence and concluded that the evidence pointing to a lower degree of impairment was more compelling.  The ALJ's adjudication of this two-sided evidence was not irrational or without a substantial basis, and I cannot review the evidence *de novo*; therefore, I can find no error on the record before me.

16.     In sum, even if the ALJ erred with respect to plaintiff's ability to get along with others, it does not undermine her conclusion that plaintiff has failed to show that she meets the Listings based on the record before me.  Still, the ALJ did not consider – at least explicitly – conflicting evidence that could move the needle in these close cases (e.g., adapting and managing).  To the extent that the ALJ reconsiders the persuasiveness of certain opinions that she discounted on the first go in light of the discussion of Dr. Jackson's testimony below, that could change the Listings determination (i.e., plaintiff might have marked impairments in two functional areas and therefore meet the requirements for paragraph B).

**Residual Functional Capacity Determination**

17.     The ALJ determined that plaintiff had sufficient RFC to perform light work, except that, among other things, plaintiff could perform low-stress work, requiring only occasional work-related decisions and changes in the work setting, and no customer service interaction with the public.  Plaintiff challenges these qualifications as not sufficiently reflective of her mental health impairment on two grounds.

18.     First, plaintiff contends that although the ALJ restricted plaintiff from having any customer service interaction, he should've restricted her to having no interaction with the public in a non-customer service setting.  This is an overly technical distinction.  Anytime an employee interacts with the public as a requirement of her job, that is a customer service interaction.  The fact that plaintiff may not be able to get along with people on the weekends does not bear on the interaction component of any job she might have.  In other words, "no customer service interaction" is just another way of saying "no public interaction on the job," since an employer views any member of the public who enters its store or facility as a potential customer.  Even if there were some slight distinction, it seems so unlikely that the distinction would affect plaintiff's ability to perform the jobs identified by the vocational expert that a remand for clarification is unwarranted.

19.     Second, and more substantively, plaintiff contends that the ALJ failed to account for the amount of time that plaintiff would be off-task or absent.  By not making a finding on that issue, plaintiff argues, the ALJ implicitly found that plaintiff would never be off-task or absent, and that finding contradicts the record.  I disagree.

20.     The ALJ and plaintiff's attorney questioned the vocational expert at the hearing extensively.  She was clear that the jobs she had identified that plaintiff could perform required an off-task rate of 10%-12% and an absence rate of about two days per month.  Thus, if the ALJ "implicitly" found anything, it was that plaintiff would not be off-task or absent beyond those numbers.

21.     Plaintiff cites nothing that required the ALJ to make an express finding on the rate of off-task work and absences that she would accrue.  And, in any event, the ALJ plainly recognized plaintiff's limitations by expressly restricting her to jobs that only required her to

understand short and simple instructions in a non-production pace setting, with low stress, and only occasional work-related decisions and changes in workplace setting.

### Analysis of Medical Opinions

22.     This point of error overlaps with plaintiff's point of error on the Listings, as discussed above.  But even though a lesser showing of error is required with respect to the determination of RFC as compared to a Listing, I agree with the Commissioner that plaintiff is merely seeking to re-weigh the evidence.  Plaintiff just sees it differently than did the ALJ.  She criticizes the ALJ's acceptance of the opinion of medical expert Dr. Linda Miller, and the rejection of Drs. Wilson and Jackson.

23.     The first reason plaintiff asserts is that the ALJ should not have found Dr. Miller's opinion "generally persuasive" – plaintiff contends it should have been given "no persuasive value."  The ALJ stated that she made her finding of general persuasiveness because Dr. Miller's opinion was consistent with the record, especially the treatment notes of neurologist Dr. Michael Boffa, who plaintiff saw privately.  Plaintiff contends that Dr. Miller improperly cited the origin of her problem as epileptic seizures rather than her protracted benzodiazepine withdrawal.  But it is easy to see how Dr. Miller combined those two origins since as plaintiff withdrew from benzodiazepine, she had repeated seizures during the relevant period and had been hospitalized for seizures three times.  As the ALJ noted, Dr. Miller's opinion was fully consistent with that of neurologist Dr. Boffa, as he advised her that her symptoms were related to untreated epilepsy. Dr. Boffa urged plaintiff on more than one occasion to take anti-seizure medication, advising her that unless she did, her symptoms were not going to get better, but plaintiff was adamant that she wanted only cannabis oil.  The record virtually screams out that plaintiff's symptoms were

caused by, at least, a combination of her drug withdrawal, untreated epilepsy, and refusal to take anti-seizure medication.

24.      Moreover, I do not see why it makes a difference what the source of plaintiff's impairment is; what is at issue with regard to disability is her symptomology, and there is sufficient evidence in the record for Dr. Miller's assessment of that.

25.      Plaintiff's second criticism of the ALJ's acceptance of Dr. Miller's opinion is that Dr. Miller testified that the protracted psychiatric symptoms to which plaintiff testified are not described in Dr. Jackson's medical records nor in Dr. Wilson's consultative report.  Plaintiff asserts that, at least as to Dr. Jackson, Dr. Miller is wrong.

26.      Plaintiff has a point.  Dr. Jackson's treatment notes reflect that she knew about and recorded plaintiff's protracted psychiatric symptoms.  Although I recognize those notes are largely limited to plaintiff's self-reporting, when it comes to psychiatric problems, that's often the best evidence we have.  Dr. Jackson's notes include plaintiff's statement that she was bedridden 70% of the time from 2016 to 2019.  The ALJ stated that Dr. Frey was aware that plaintiff was bedridden, but nothing in the decision reflects the ALJ's awareness that Dr. Jackson included that information in her notes.  Additionally, there is no mention of Dr. Jackson's note that plaintiff's anxiety caused many concerning symptoms, including hair loss, constant exhaustion, lack of coordination (dropping things), elevated heart rate, and sudden agitated states.  Dr. Miller's claim that Dr. Jackson's notes do not reflect plaintiff's psychiatric symptoms is therefore incomplete, if not wrong.[1]

---

[1] Plaintiff's remaining contentions in this section – that the ALJ erred by finding Dr. Wilson's, Dr. Frey's, and E. Gagnon's opinions unpersuasive – sound more like plaintiff simply disagrees with how the ALJ saw things.  The ALJ reasonably found that those opinions were inconsistent with other evidence in the record, and did not err by finding them unpersuasive.

**Vocational Expert Evidence**

27.     Plaintiff contends that there are inconsistencies between the vocational expert's testimony and the Dictionary of Occupational Titles.  There is one inconsistency which requires remand.

28.     Plaintiff asserts that because the jobs identified by the vocational expert are assembly jobs, which invariably require a "production pace," they are inconsistent with the limitation that the ALJ placed on plaintiff (i.e., only jobs with a "non-production paced setting"). The vocational expert testified that the three jobs she identified – "assembler of plastic hospital products"; "marker"; and "ampoule sealer" – do not require a production pace.  Plaintiff's rejoinder is: how could they not?  If someone is charged with assembling plastic hospital products, isn't it inherently part of the job that they produce a certain number of products over some set period of time, below which number they will not have "produced" at a "pace" sufficient for their employer and will fail at the job?  If someone is charged with putting stickers on products (essentially the job of a "marker"), if they put far fewer stickers on products than their co-workers over the same period of time, will they, again, not have "produced" enough stickered products at a "pace" required by the employer?  The same seems true of an employee who has to repeatedly seal an ampoule.

29.     This was the subject of testimony at the hearing, but that testimony leaves me unenlightened as to what the vocational expert and the ALJ were trying to express.  The most succinct statement from the vocational expert's testimony was: "One [a production-pace] has to do with the speed.  One [a non-production pace] has to do with just producing the things within the eight hours allowed."  But as the vocational expert conceded, the number of widgets doesn't change.  Say an employee in a "production pace" setting has to produce five widgets per hour,

whereas in a "non-production pace" setting she has to produce 35 widgets in an eight-hour day (with one hour for lunch).  Her production obligation is the same.

30.      If what the ALJ was trying to express is that plaintiff can't handle the stress of making five widgets per hour but could handle the stress of making 35 widgets per day, the rationale for that conclusion is not apparent in the record.  There is no evidence of a differential that would permit the ALJ to decide which pace is most accommodating for an employee who is unable to tolerate high stress.  Frankly, all three jobs identified by the vocational expert sound more or less like assembly line jobs, and how those employers measure productivity – by hour or by day – does not seem to bear on plaintiff's ability to perform them. The case needs to be remanded so that the ALJ can clarify this.

### Length of Plaintiff's Disability

31.      Plaintiff argues that even if she was not disabled throughout her insured period, she was disabled for at least a year within that period, and the ALJ erred by not finding her disabled for a closed period.  This point has no merit.  The evidence upon which plaintiff relies for a closed period was all subsequent to her date last insured. Although such evidence can have a "lookback" aspect depending on its nature, the post-insured period that plaintiff wants to use does not help her.  Even plaintiff does not identify the closed period of disability she thinks the ALJ should have found.  The evidence she cites does not undermine the ALJ's conclusion that until her date last insured, she was not disabled.

### Limitation of Evidence

32.      Plaintiff claims that the ALJ prevented plaintiff from calling her husband as a witness to corroborate her testimony.  It should be noted that there were three hearings in this case and plaintiff was represented by counsel at all of them.  Her attorney was quite active,

examining plaintiff and cross-examining the medical expert and the vocational expert.  However, at no time did plaintiff's counsel ever request that her husband be permitted to testify.  The closest he came was writing a letter to the ALJ stating: "Please be advised that after speaking with the claimant, we would respectfully request that her husband, Chris Lindstrom, be allowed to provide emotional support for the claimant during the hearing."  That is not a request for her husband to testify.  It's a recognition that social security hearings are closed and that the ALJ's permission is needed for any non-party to attend.  This is confirmed by the fact that plaintiff rested her case without mentioning any intent or desire to call her husband.

<u>**Conclusion**</u>

33.     For the foregoing reasons, plaintiff's motion for judgment on the pleadings and the Commissioner's cross-motion for judgment on the pleadings are granted in part and denied in part.  This case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) so that the Commissioner can determine whether there is any difference between a production paced setting and a non-production paced setting and, if so, whether that difference alters the Commissioner's conclusion that plaintiff can perform light work with the restrictions she has imposed.  And since the ALJ's impairment findings turned in part on the decision to credit Dr. Miller's testimony and discount Dr. Jackson's notes and records, the ALJ should consider whether reweighing these opinions' degrees of persuasiveness changes the conclusion as to the Listings.  In making those determinations, the Commissioner may conduct an additional

hearing with vocational experts and may obtain additional medical evidence that bears on these questions.

**SO ORDERED.**

_Brian M. Cogan_
_____
                                    U.S.D.J.

Dated: Brooklyn, New York
       March 26, 2024